[No. A075251. First Dist., Div. Two. Jan. 12, 1998.†]

ALLYN BETH LANDAU, Petitioner, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN
FRANCISCO, Respondent;
MEDICAL BOARD OF CALIFORNIA, Real Party in Interest.

[No. A075493. First Dist., Div. Two. Jan. 12, 1998.]

ALLYN BETH LANDAU, Plaintiff and Appellant, v.
MEDICAL BOARD OF CALIFORNIA, Defendant and Respondent.

[Opinion certified for partial publication.‡]

†Review granted April 15, 1998. Review was dismissed on June 14, 2000, and the opinion was directed to be partially published.
‡Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III., IV. and VI.

**COUNSEL**

Tanke & Willemsen, Tony J. Tanke and Gary L. Simms for Petitioner and for Plaintiff and Appellant.

No appearance for Respondent Superior Court.

Daniel E. Lungren, Attorney General, Robert L. Mukai, Chief Assistant Attorney General, Alvin J. Korobkin, Assistant Attorney General, Vivien Hara Hersh and Alfredo Terrazas, Deputy Attorneys General, for Real Party in Interest and for Defendant and Respondent.

**OPINION**

**KLINE, P. J.—**

### INTRODUCTION

In this opinion, we consider, among other things, the constitutionality of the provision of Business and Professions Code section 2337 requiring that

appellate court review of a superior court decision reviewing the revocation, suspension or restriction of a physician's medical license by the Medical Board of California be by way of a petition for extraordinary writ. We shall conclude the statute is constitutional.

Effective March 16, 1996, the Medical Board of California revoked the medical license of Dr. Allyn Beth Landau, following extensive administrative proceedings before an administrative law judge. The San Francisco Superior Court denied her petition for a writ of administrative mandamus (Code Civ. Proc., § 1094.5). Dr. Landau filed both an appeal (case No. A075493) and, pursuant to Business and Professions Code section 2337, a petition for a writ of mandate (case No. A075251) challenging the superior court decision.

We consolidated the appeal and the writ petition and ordered supplemental briefing on the legislative history of Business and Professions Code section 2337. We issued an order to show cause in connection with the writ petition.

Dr. Landau challenges the actions of the administrative law judge (ALJ), the Medical Board of California, and the superior court on numerous grounds.[1] In this opinion, we reject her claims that Business and Professions Code section 2337 unconstitutionally denies her right to a direct appeal, accompanied by an entitlement to oral argument and a written opinion on the

---

[1]Claims of error raised by Dr. Landau both in her appeal and on her writ petition include the following:

1. She was denied procedural due process during the administrative proceedings by the ALJ's refusal to admit, on the grounds of hearsay, prior reports of experts retained by the Medical Board who had determined there existed no grounds for prosecuting her for negligence or incompetence.

2. *She was denied due process by the ALJ's allowing the prosecutor to use stolen privileged documents during the hearing.* (The ALJ in fact ruled these documents inadmissible.)

3. The failure of the Medical Board to identify which of its members revoked her license violated the Medical Practice Act and denied her due process.

4. The trial court failed to apply the independent review standard to its review of the administrative proceedings and refused to consider the clear and convincing standard applicable in the administrative proceeding.

5. The findings of gross negligence upheld by the superior court are not supported by the medical evidence.

6. The ALJ and the superior court erred in rejecting Dr. Landau's affirmative defense of discriminatory enforcement and discipline.

7. The Medical Board prosecution was barred by laches.

8. The maximum penalty of revocation was arbitrary and excessive.

9. Application of Business and Professions Code section 2337 to this case violates the presumption against retroactive application of a statute, violates her constitutional rights to due process and equal protection of the laws, and denies her right to an appeal under article VI, section 11, of the California Constitution.

merits; denies her both equal protection and due process of the law; and in her case constitutes an impermissible retroactive application of the statute. We shall therefore dismiss the appeal. On the merits of her writ petition, we shall affirm the judgment and deny the petition.

## STATEMENT OF FACTS/STATEMENT OF THE CASE

On April 29, 1993, the Medical Board of California (hereafter Board or Medical Board) filed two separate causes for disciplinary action, seeking revocation of Dr. Landau's medical license for alleged multiple and serious violations of the Medical Practice Act in the care and treatment of two patients in 1986 and 1987. (Bus. & Prof. Code, § 2000 et seq.)

The allegations centered around the care and treatment of two patients, S.B., a 37-year-old male and J.Y., a 27-year-old female. On December 20, 1995, following a nine-day administrative hearing, ALJ Michael C. Cohn issued a detailed "Proposed Decision" finding cause for disciplinary action against Dr. Landau. The ALJ found such cause was established for gross negligence (Bus. & Prof. Code, § 2234, subd. (b)), as Dr. Landau's failure to follow up with patients S.B. and J.Y. to advise them of suspicious and/or inconclusive biopsy results constituted in each instance an extreme departure from the standard of care. (Proposed Decision, Findings Nos. 20 and 34, Determination of Issues Nos. 2 and 5.) Cause for disciplinary action was further established for gross negligence (Bus. & Prof. Code, § 2234, subd. (b)) and/or incompetence (Bus. & Prof. Code, § 2234, subd. (d)) by reason of Dr. Landau's allowing her medical assistant to evaluate and remove pigmented lesions from J.Y., including taking samples for biopsy, which conduct constituted an extreme departure from the standard of medical care. (Proposed Decision, Finding No. 30, Determination of Issue No. 3.) The ALJ determined that the public interest demanded revocation of Dr. Landau's certificate to practice medicine. (Proposed Decision, Determination of Issue No. 7.)

On February 15, 1996, the Division of Medical Quality of the Medical Board adopted the proposed decision of the ALJ, revoking Dr. Landau's certificate of licensure as a physician and surgeon, effective March 16, 1996. (Order dated Feb. 15, 1996.)

On March 15, 1996, on Dr. Landau's ex parte application, the superior court issued a two-week stay order of the Medical Board's decision revoking her license and scheduled an expedited hearing on her Code of Civil Procedure section 1094.5 petition for writ of mandate.

On April 1, 1996, after conducting oral argument, the court filed its eight-page order denying the petition for writ of mandate. The court discharged the stay and ordered the Medical Board to prepare a statement of decision in conformity with the court's order.

On April 16, 1996, Dr. Landau moved for a new trial and for an order setting aside and vacating the judgment. On June 5, 1996, the superior court denied these motions and filed a detailed 17-page statement of decision.

On August 6, 1996, appellant filed a notice of appeal. On August 12, 1996, the Medical Board filed an objection to the notice of appeal on the grounds that pursuant to Business and Professions Code section 2337 this court lacked jurisdiction to take action on anything other than a petition for extraordinary writ. On August 12, 1996, Dr. Landau filed a petition for extraordinary writ. On December 23, 1996, we issued an order that the writ petition and the appeal would be considered together and on July 31, 1997, we issued an order to show cause on the petition for extraordinary writ.

I.

*Writ Review versus Appeal*

Review of a decision of the Division of Medical Quality revoking, suspending or restricting a medical license is by writ of administrative mandamus in the superior court. (Code Civ. Proc., § 1094.5.) Traditionally, review of the superior court decision has been by direct appeal[2] from the final judgment or order of the superior court granting or denying the writ petition. Effective January 1, 1996, the Legislature has provided that appellate review of the superior court's decision shall be pursuant to a petition for an extraordinary writ. (Bus. & Prof. Code, § 2337.)[3]

This amendment eliminated direct appeal via Code of Civil Procedure section 1094.5 from the superior court decision granting or denying the

---

[2]Subsequent references in this opinion to "direct appeals" should be understood to mean a procedure for appellate review that includes oral argument, a decision on the merits, and a written opinion. (See *Powers v. City of Richmond* (1995) 10 Cal.4th 85, 91, fn. 1 [40 Cal.Rptr.2d 839, 893 P.2d 1160].)

[3]"Notwithstanding any other provision of law, superior court review of a decision revoking, suspending, or restricting a license shall take preference over all other civil actions in the matter of setting the case for hearing or trial. The hearing or trial shall be set no later than 180 days from the filing of the action. Further continuance shall be granted only on a showing of good cause.

"*Notwithstanding any other provision of law, review of the superior court's decision shall be pursuant to a petition for an extraordinary writ.*" (Bus. & Prof. Code, § 2337, as amended by Stats. 1995, ch. 708, § 10.5, italics added.)

petition for writ of mandate and substituted discretionary writ review by the appellate court. Dr. Landau contends this provision cannot be applied to deny her a direct appeal from the superior court judgment. In the alternative, she argues she is entitled to issuance of an alternative writ or an order to show cause "because she will have no adequate remedy at law." The Medical Board contends Dr. Landau is entitled to neither issuance of an alternative writ or order to show cause nor to direct appeal of the superior court decision.

We recognize that issuance of the order to show cause in this case has arguably rendered this issue moot, as Dr. Landau has been afforded oral argument, a decision on the merits and a written opinion. ■ Nevertheless, we examine her claim, which amounts to an assertion that in every case to which Business and Professions Code section 2337[4] applies, and in which a timely, procedurally sufficient petition is filed, the appellate court *must* issue an alternative writ or order to show cause. In this assertion, she is simply wrong. We therefore consider Dr. Landau's claims that in relegating her to review by extraordinary writ, the statute runs afoul of *Powers v. City of Richmond, supra,* 10 Cal.4th 85, denies her equal protection of the laws, and violates her due process rights.

A. *Powers v. City of Richmond.*

Both Dr. Landau and the Medical Board rely upon the recent California Supreme Court opinion *Powers v. City of Richmond, supra,* 10 Cal.4th 85 (hereafter *Powers*), upholding the constitutionality of section 6259, subdivision (c) of the Public Records Act (hereafter PRA) (Gov. Code, § 6250 et seq.), providing that superior court decisions in PRA cases are not appealable but instead are "immediately reviewable by petition to the appellate court for the issuance of an extraordinary writ." Dr. Landau claims the lead opinion supports her assertion that a writ petition pursuant to section 2337 may not be summarily denied because there is no adequate remedy by way of appeal.

In *Powers,* the lead opinion of Justice Kennard, joined by Justices Baxter and Werdegar, stated that article VI, section 11 of the California Constitution[5] does not confer upon litigants a right of direct appeal from final orders and judgments in proceedings in which superior courts exercise original jurisdiction. (*Powers, supra,* 10 Cal.4th at pp. 91-93 (lead opn. of Kennard, J.).) Rather, the term "appellate jurisdiction" used therein is simply the power of a reviewing court to correct error·in a trial court proceeding. "By

---

[4]All statutory references to section 2337 are to the Business and Professions Code unless otherwise indicated.

[5]"The Supreme Court has appellate jurisdiction when judgment of death has been pronounced. With that exception courts of appeal have appellate jurisdiction when superior courts have original jurisdiction and in other causes prescribed by statute.

common understanding, a reviewing court may exercise this power in the procedural context of a direct appeal, a writ petition, or otherwise." (*Id.* at p. 93.) The grant of judicial authority contained in the constitutional provision has been interpreted to mean that "although the Legislature may regulate the mode of appellate review, it may do so only to the extent that it does not thereby ' "substantially impair the constitutional powers of the courts, or practically defeat their exercise." ' [Citations.] If it could be demonstrated in a given case, or class of cases, that, for whatever reason, the Courts of Appeal or this court could not effectively exercise the constitutionally granted power of appellate review by an extraordinary writ proceeding, then such a proceeding could not constitutionally be made the exclusive mode of appellate review." (*Id.* at p. 110.) Dr. Landau makes no such claim here.

The *Powers* lead opinion addressed the "misperception" that "appellate review by extraordinary writ petition is inherently less effective than a remedy by direct appeal because issuance of the extraordinary writs is discretionary whereas direct appeal guarantees a decision on the merits." (*Powers, supra,* 10 Cal.4th at p. 113 (lead opn. of Kennard, J.).) Observing that the discretionary aspect of writ review comes into play primarily when the petitioner has another remedy by appeal and the issue is whether the alternative remedy is adequate, the lead opinion then observed: "When an extraordinary writ proceeding is the only avenue of appellate review, a reviewing court's discretion is quite restricted. . . . [W]hen writ review is the exclusive means of appellate review of a final order or judgment, an appellate court may not deny *an apparently meritorious writ petition,* timely presented in a formally and procedurally sufficient manner, merely because, for example, the petition presents no important issue of law or because the court considers the case less worthy of its attention than other matters." (*Id.* at pp. 113-114, italics added.) Thus, the lead opinion recognizes that summary disposition of a writ petition is appropriate where a petition is formally and procedurally sufficient but appears to the appellate court to be without merit. This reading of the lead opinion is verified by its rejection of the dissent's assertion that the PRA reveals "a legislative intent to invest the Courts of Appeal with discretion to summarily deny extraordinary writ petitions on grounds unrelated to the merits of the PRA action or to the formal or procedural sufficiency of the petition." (*Id.* at p. 114, fn. 19.) Observing that the Legislature had disclosed no purpose to alter established rules of law governing extraordinary writs, the lead opinion reaffirmed that ". . . an appellate court may deny an extraordinary writ petition

---

"Superior courts have appellate jurisdiction in causes prescribed by statute that arise in municipal courts in their counties.

"The Legislature may permit appellate courts to take evidence and make findings of fact when jury trial is waived or not a matter of right." (Cal. Const., art. VI, § 11.)

summarily—that is, without issuing an alternative writ or order to show cause, without affording the parties an opportunity for oral argument, and without issuing a written opinion—and that this power of summary denial distinguishes writ review from direct appeal." (*Ibid.*)

Accordingly, the lead opinion recognizes that an appellate court retains discretion to summarily deny extraordinary writ petitions on grounds related to the apparent merits of the action as well as upon grounds related to the formal or procedural sufficiency of the petition.

In a concurring opinion, Justice George, joined by Justice Arabian, agreed with the lead opinion's conclusion that Government Code section 6259, subdivision (c) could constitutionally limit appellate review of trial court rulings on claims brought under the PRA to petitions for extraordinary writ. (*Powers, supra,* 10 Cal.4th at pp. 115-116 (conc. opn. of George, J.).) However, the concurring justices would limit the holding to the specific PRA provision at issue. They refused to join the lead opinion in announcing a "broad constitutional rule that may be understood to validate virtually all, or at least most, legislative measures that in the future might substitute writ review for direct appeal in contexts not presented by the case now before us." (*Id.* at p. 116.) The concurring justices observed that "in enacting the statutory provision here at issue, the Legislature simply has concluded that, because of the special importance of obtaining a very prompt appellate resolution in the relatively small and discrete class of cases brought under the Public Records Act, appellate review of a superior court ruling *in such cases* should proceed by extraordinary writ rather than by direct appeal." (*Id.* at p. 117, italics in original.) Further, the legislative background of the PRA demonstrated that Government Code section 6259, subdivision (c) was not enacted to diminish the rights of individuals seeking disclosure under the act, but "for the general purpose of enhancing such persons' rights by ensuring that appellate review of trial court decisions under the act is conducted in a manner that promotes, rather than frustrates, the purpose of the act." (10 Cal.4th at p. 118.) The concurring opinion observed the plaintiffs had not contended that superior court actions under the PRA were "so factually or legally complex that the Legislature could not reasonably have concluded that the Courts of Appeal properly could review trial court orders in such cases through the traditional extraordinary writ procedure, rather than the more elaborate and time consuming process of a direct appeal." (*Id.* at p. 121.) Nor did the plaintiffs contend there was anything in the nature of the particular rights or interests at stake in a PRA proceeding such that limiting appellate review of a trial court ruling to review by extraordinary writ inadequately would protect the interests at issue. (*Ibid.*)

In dissent, Chief Justice Lucas and Justice Mosk argued that California Constitution article VI, section 11 confers upon litigants a right of direct

appeal of a judgment of the superior court finally resolving a cause of action within the original jurisdiction of the superior court. According to the dissent, although the Legislature may condition direct appeal upon prior "exhaustion" of writ review procedures, it may not substantially impair the constitutional right of appeal by barring appeal in cases in which the litigants first properly sought, but were summarily denied, writ review. (*Powers, supra,* 10 Cal.4th at pp. 124, 128, 183 (dis. opn. of Lucas, C. J.).)

Our review of section 2337 in light of *Powers,* the legislative history[6] and the statutory purpose persuades us that the statute does not run afoul of article VI, section 11 of the California Constitution.

Section 2337 was originally enacted as part of Senate Bill No. 2375 (1989-1990 Res. Sess.) (Senate Bill 2375) introduced by Senator Robert Presley in 1990 (Stats. 1990, ch. 1597, § 26, p. 7696), as a component of a comprehensive overhaul of the physician discipline system operated by the Medical Board. (See excerpts regarding section 2337 from all versions of Sen. Bill 2375.) The bill was sponsored by The University of San Diego's Center for Public Interest Law as a reaction to a crisis in the system for physician discipline. (Sen. Com. on Judiciary, Analysis of Sen. Bill 2375, as amended June 4, 1990.) As described in the Enrolled Bill Report of the State and Consumer Services Agency, Department of General Services: "This bill is sponsored by the Center for Public Interest Law . . . . It stems from a study on the MBC [Medical Board of California], the results of which were published in an April, 1989 report entitled 'Physician Discipline in California: A Code Blue Emergency.' That study concluded that vast changes were needed in the discipline system for medical professionals, including a means of increasing the number of professionals being disciplined and *methods for short-cutting the lengthy hearing and appeal process.* The Consumers Union and other consumers and patients' rights groups are in support of the bill." (State and Consumer Services Agency, General Services, Enrolled Bill Rep. for Sen. Bill 2375, Sept. 4, 1990, p. 1, italics added.)

Among the several concerns at which the legislation was aimed was the excessive amount of time consumed by the disciplinary process. The Senate Committee on Business and Professions Staff Report included the following comment: "The sponsor asserts that the entire process [including administrative hearing, superior court review, appeal to the Court of Appeal, petition for review to the California Supreme Court, and petition for certiorari to the

---

[6]At our request, the parties have provided extensive analysis of the legislative history of this measure. We take judicial notice of this legislative history and supporting documentation. (Evid. Code, §§ 451, 452, 459; *Schmidt v. Southern Cal. Rapid Transit Dist.* (1993) 14 Cal.App.4th 23, 30, fn. 10 [17 Cal.Rptr.2d 340] ["In a search to discern legislative intent, an appellate court is entitled to take judicial notice of the various legislative materials, including committee reports, underlying the enactment of a statute."].)

United States Supreme Court] takes up to 8 years to complete, during which time the physician continues to practice. The Medical Board, however, indicates that in nearly all cases, this process takes about 3 years and that only one or two unique cases in the past have taken up to 8 years to complete." (Sen. Com. on Business and Professions, Analysis of Sen. Bill 2375, p. 2.)

As the Center for Public Interest Law Report indicated, appellate review played a major part in the overall duration of the disciplinary process. "Court of Appeal review normally takes several years to complete." (Center for Public Interest Law, Physician Discipline in California: A Code Blue Emergency (Apr. 5, 1989) p. 22.) The Center for Public Interest Law advocated elimination of superior court review entirely, to be replaced by "direct appeal" to the Court of Appeal. (Sen. Com. on Business and Professions, Analysis of Sen. Bill 2375, p. 7.) Although at one point incorporated in the bill, the elimination of superior court review was eventually taken out of the measure. (See Robert Fellmeth and Steve Barrow, Center for Public Interest Law, letter to Sen. Robert Presley regarding Sen. Bill 2375, May 1990.)

In 1993, Senator Presley introduced Senate Bill No. 916 (1993-1994 Reg. Sess.) (Senate Bill 916), described in the Senate Business and Professions Committee Report as intended "to reform and improve the system for disciplinary enforcement over licensees of the Medical Board." (Sen. Com. on Business and Professions, Rep. on Sen. Bill 916.) Senator Presley described Senate Bill 916 as a "follow up" to Senate Bill 2375. (Sen. Business and Professions Com. Rep. on Sen. Bill 916, for hearing date Apr. 12, 1993, p. 5.) As originally introduced, Sen. Bill 916 amended section 2337 to eliminate superior court review of decisions of the Medical Board, providing instead that "review of final decisions of an administrative law judge from the Medical Quality Hearing Panel shall be exclusively by appeal directly to the Third District Court of Appeal, which shall exercise its independent judgment in its review of the proceedings below." (Sen. Bill 916, as introduced by Sen. Robert Presley, Mar. 3, 1993, § 25, p. 32.) As it progressed through the Legislature in 1993, the language of section 2337 was changed to restore superior court review until January 1, 1995, but also to provide for elimination of superior court review to be replaced by review in the appellate courts by writ of mandamus pursuant to Code of Civil Procedure section 1094.5 beginning January 1, 1995, and operative until January 1, 1999. (Sen. Bill 916; Stats. 1994, ch. 1267, filed with Secretary of State Oct. 11, 1993.) Before this provision for direct review in the Court of Appeal became effective, it was amended to extend the effective date to January 1, 1996. (Stats. 1994, ch. 1206, § 23.)

In February 1995, Senator Herschel Rosenthal introduced Senate Bill No. 609 (1995-1996 Reg. Sess.) (Senate Bill 609), at the request of the Medical

Board and "in order to close loopholes in existing law relating to the reporting of felony convictions of physician[s] and surgeons to the MBC [Medical Board and in order to increase the enforcement capabilities of the MBC." (Sen. Business and Professions Com. Rep. on Sen. Bill 609, for hearing date Apr. 3, 1995, p. 2.)

On July 7, 1995, Senate Bill 609 was amended in the Assembly to add new sections 10.5 and 10.7 to the bill. These amendments repealed that part of section 2337 providing for direct review of Medical Board decisions in the Court of Appeal effective January 1, 1996. Instead, superior court review would remain in effect and appeal of the superior court's decision would be "by means of a writ of review pursuant to section 1067 of the Code of Civil Procedure." (Sen. Bill 609, as amended in Assem. July 7, 1995.) The decision to "keep in place the current process of board disciplinary decisions by the superior court and to eliminate the direct appellate review process established two years ago with enactment of SB 916 (Presley)" came in response to concerns raised by the California Judicial Council. (Assem. Com. on Health, Rep. on Sen. Bill 609, July 11, 1995.)

On August 10, 1995, the California Medical Association (CMA) wrote to the executive director of the Medical Board suggesting further amendments, including changing the language of section 2337 to provide that "Notwithstanding any other provision of law, review of the Superior Court's decision shall be by way of extraordinary writ." (Timothy J. Shannon, Jr., CMA, letter to Dixon Arnett, Aug. 10, 1995, contained in legislative bill file of the Sen. Com. on Business and Professions on Sen. Bill 609, pp. 40-42.)

On August 21, 1995, Senate Bill 609 was amended in the Assembly so that the second paragraph of section 2337 reads as it does now. (Sen. Bill 609, as amended in Assem., Aug. 21, 1995, pp. 21-22.)

On September 8, 1995, the Attorney General wrote to Senator Rosenthal arguing for deletion of this provision on the basis that it could prejudice the Medical Board, and thereby the public, which—in the event of an erroneous superior court decision—would be "totally dependent upon the court of appeal granting a petition for an extraordinary writ, something which it rarely does today." (Daniel Lungren, letter to Sen. Herschel Rosenthal, Sept. 8, 1995, from the legislative bill file of Sen. Rosenthal on Sen. Bill 609.)[7]

---

[7]In urging Senator Rosenthal to delete section 10.5 (the appellate court writ review provision) of Senate Bill 609, the Attorney General argued in pertinent part:

The Legislature passed Senate Bill 609 unanimously on September 11, 1995, and it was signed by the Governor on October 9, 1995. (Sen. Weekly Hist., Thurs., Feb. 1, 1996, pt. 1 of 3.) In a September 21, 1995, letter to the Governor urging signature, Senator Rosenthal reiterated that the bill "institutes the recommendations of the Judicial Council in regard to the appellate process for physician discipline cases." (Material from the Legislative file of Sen. Rosenthal on Sen. Bill 609.)

The legislative history of section 2337 makes clear that the statute was a response to one aspect of a perceived crisis in physician discipline procedures—that of lengthy delays in the final imposition of discipline. The provision for writ review in the Court of Appeal was intended to expedite the completion of judicial review of physician discipline decisions and to shorten the overall time for these cases irrespective of which party prevailed at the superior court level.

Dr. Landau does not dispute that writ review will accomplish the goal of shortening the overall time for these cases by expediting judicial review. In cases where the Board has imposed discipline suspending or revoking a license, and the superior court has refused to issue a writ overturning that decision, appellate review by writ of mandate enables the appellate court to

---

"The meaning of section 10.5 of SB 609 is that the existing right of appeal which is available when a superior court improperly grants a writ of mandate against the Medical Board of California or the Board of Podiatric Medicine under Code of Civil Procedure section 1094.5, will be extinguished. The boards would instead be totally dependent upon the court of appeal granting a petition for an extraordinary writ, something which it rarely does today. This means that the public will be at risk if the superior court improperly sets aside a decision suspending or revoking the medical license of a dangerous physician and the court of appeal declines to exercise its discretion to issue an extraordinary writ.

"Section 10.5, when considered in conjunction with another newly-amended provision of SB 609, also has a strong tendency to withdraw disciplinary authority from the affected multi-member bodies and instead concentrate it in decisions of individuals within state government and the judiciary. Current law empowers the boards themselves to decide cases on consideration of the evidentiary record of the hearings. Section 10.1 of SB 609 instead requires the affected boards to 'give great weight to the findings of fact' made by the individual employed to hold the hearing, thus concentrating in a single functionary much of the power that was intended to be exercised through the collective authority of the board's members. The decision resulting from this administrative process is then subject to review by a single superior court judge, invoked by the filing of a petition for writ of mandate by the disciplined licensee. When a writ of mandate is improperly granted, section 10.5 means that the decision of that single judge will no longer be subject to correction by obligatory appeal to the justices of the court of appeal. Thus, licensure of the affected health care professions is substantially deprived of the benefit of the board's expertise over licensing decisions, and of the collective wisdom of the court of appeal bearing upon the process of judicial review." (Daniel Lungren, letter to Sen. Herschel Rosenthal, Sept. 8, 1995, fn. omitted, underscoring in original.)

dispose of a petition that has no apparent merit relatively quickly. Similarly, where the superior court has issued a writ overturning the Board's imposition of discipline, appellate writ review pursuant to section 2337 would benefit the physician by shortening the time to final decision.[8]

As we read the *Powers* lead and concurring opinions (*Powers, supra,* 10 Cal.4th 85), a majority of our Supreme Court does not require that an alternative writ or order to show cause issue in every instance in which a timely, procedurally sufficient, but apparently meritless writ petition is filed. Indeed, such requirement would undermine the purpose of speedy resolution.[9]

Dr. Landau asserts that, unlike the PRA at issue in *Powers*, physician discipline cases subject to section 2337 are likely to be both factually and legally complex. She makes no attempt to explain why physician discipline cases are likely to be more complex than cases arising under the PRA or any other class of cases, and we do not view this case as so complex either factually or legally as to render it inappropriate for writ review.

Dr. Landau further argues the public interest will be adversely affected by denial of direct appeal in cases where the Medical Board is seeking review of a superior court decision overturning the Board's discipline of a physician. This mirrors a concern raised by the Attorney General in his September 8, 1995, letter to Senator Rosenthal. The Legislature reasonably could determine that the public interest was better protected by expediting resolution of physician discipline cases than by requiring oral argument and a

[8]We note that the benefits of speed which are envisioned by the statute are most likely to occur in cases where the claim raised by the writ petition is without apparent merit and suitable for summary disposition. Once an order to show cause has issued, the matter becomes a cause and is put on calendar for oral argument and disposition. In such cases, the time consumed by the writ proceeding will often be no different from that which would be required if the matter proceeded by direct appeal.

[9]We are mindful that summary denial of a writ petition is not "on the merits" for law of the case purposes. (*Kowis v. Howard* (1992) 3 Cal.4th 888, 897 [12 Cal.Rptr.2d 728, 838 P.2d 250].) Generally, this will have limited effect as law of the case doctrine is usually applied to subsequent retrial following reversal by the Court of Appeal. As a practical matter, reversal and summary denial of a writ petition are inconsistent. Reversal will usually be preceded by issuance of an alternative writ or order to show cause, making the matter a "cause" and resulting in a decision on the merits and a written opinion. The Medical Board argues that *Kowis* applies only to pretrial writ proceedings and not to extraordinary writ review of final judgments of the superior court. We find no authority supporting this distinction, which we think unreasonable. Indeed, as a writ petition may be summarily denied because it is not timely or procedurally sufficient, it is clear that not all summary denials of such writ petitions will be on the merits. If summary denial of a writ petition prevents application of law of the case principles, so be it.

written opinion in every instance of appellate review of the superior court's judgment reviewing the discipline decision of the Medical Board.[10]

B. *Equal Protection Claim.*

Dr. Landau asserts that in depriving her of the option of a direct appeal section 2337 violates her equal protection rights by treating physicians differently from other licensed professionals. She contends her right to continue to practice her licensed profession is fundamental and that we must therefore review her equal protection claim under the strict scrutiny standard of review. We disagree.

"[T]he equal protection clause requires that those similarly situated not be treated differently unless the disparity is justified." (*Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 914 [13 Cal.Rptr.2d 245, 838 P.2d 1198]; *Kenneally v. Medical Board* (1994) 27 Cal.App.4th 489, 495 [32 Cal.Rptr.2d 504].) "The Fourteenth Amendment's guarantee of equal protection and the California Constitution's protection of the same right (Cal. Const., art. I, § 7, subd. (a), art. IV, § 16, subd. (a)) are substantially equivalent and are analyzed in a similar fashion. [Citations.]" (*Kenneally v. Medical Board, supra,* at p. 495.)

"In considering an equal protection challenge, 'we must first determine the appropriate standard of review. [Citation.] The proper standard of review, as developed by the high court, depends upon the classification involved in, and interests affected by, the challenged law.' (*Bowens v. Superior Court* (1991) 1 Cal.4th 36, 42 [2 Cal.Rptr.2d 376, 820 P.2d 600].) The traditional approach involves two tiers. [Fn. omitted.] 'The challenged law will be subject to strict scrutiny only if it operates to the peculiar disadvantage of a suspect class [citation] or impinges on a fundamental right [citation].' (*Ibid.; Board of Supervisors v. Local Agency Formation Com., supra,* 3 Cal.4th at p. 913.) 'Under this very severe standard, a discriminatory law will not be given effect unless its classification bears a close relation to the promoting of a compelling state interest, the classification is necessary to achieve the government's goal, and the classification is narrowly drawn to achieve the goal by the least restrictive means possible.' (*Board of Supervisors v. Local Agency Formation Com., supra,* 3 Cal.4th at p. 913.)

---

[10]Nor do we subscribe to Dr. Landau's argument that the Legislature did not know it was making review discretionary when it amended section 2337 to make review pursuant to a petition for extraordinary writ, rather than by direct appeal. The language of the section speaks for itself.

Clearly, reference to prior versions of the statute when appeal was to the Court of Appeal directly does not indicate the Legislature did not understand what it was doing in eliminating these provisions and replacing them with the current language.

"Recognizing it is the Legislature's responsibility to draw distinctions between groups, and the lines can rarely be precisely drawn, courts generally apply the rational basis test to most legislation. The rational basis test is routinely applied in areas of economic regulation. (*Rittenband* v. *Cory* (1984) 159 Cal.App.3d 410, 417 [205 Cal.Rptr. 576].) 'The "standard formulation of the test for minimum rationality" [citation] is whether the classification is "rationally related to a legitimate governmental purpose." [Citation.] Put another way, the classification must bear some fair relationship to a legitimate public purpose.' (*Board of Supervisors* v. *Local Agency Formation Com., supra,* 3 Cal.4th at p. 913.)" (*Kenneally* v. *Medical Board, supra,* 27 Cal.App.4th 489, 495-496.)

*Kenneally* v. *Medical Board, supra,* 27 Cal.App.4th 489 is dispositive of Dr. Landau's claim that she has a fundamental right to continue to practice her licensed profession. In *Kenneally,* a physician contended that Government Code section 11511 denied him equal protection (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7) by restricting prehearing depositions in physician disciplinary proceedings. The Court of Appeal refused to utilize strict scrutiny review and held the rational basis test was the standard of review applicable to the doctor's claim.

The *Kenneally* court reasoned: " '[T]here is no fundamental constitutional right to work for, or to have continued employment with, a particular public or private employer.' [Citations.]" (*Kenneally* v. *Medical Board, supra,* 27 Cal.App.4th at p. 496.)

"Nor is there a distinction for equal protection purposes between the obtaining of a professional license and the maintaining of that license. [Citation.] 'No person can acquire a vested right to continue, when once licensed, in a business, trade or occupation which is subject to legislative control under the police powers.' [Citation.] '[T]o the extent the license is subject to the state's police power, it is not vested.' [Citations.]" (*Kenneally* v. *Medical Board, supra,* 27 Cal.App.4th at p. 497.)

Further, *Kenneally* distinguished cases, such as those cited by Dr. Landau, which refer to the right to practice a lawful occupation as "vested" or "constitutionally protected." (*Laisne* v. *Cal. St. Bd. of Optometry* (1942) 19 Cal.2d 831, 834 [123 P.2d 457].)[11] "Language from cases that discuss a trial court's independent review of administrative proceedings on mandamus

---

[11]Other cases cited by Dr. Landau in support of the application of strict scrutiny do not apply that level of review and do not even address the issue. *Hewitt* v. *Board of Medical Examiners* (1906) 148 Cal. 590 [84 P. 39] held provisions of a statute authorizing the Board of Medical Examiners to revoke the certificate of a physician for "grossly improbable

does not compel the conclusion an individual has a fundamental right for equal protection purposes to his occupation. In this situation, the courts have called one's occupation 'fundamental.' However, our Supreme Court has made it clear that there is a distinction between an interest which is 'fundamental,' such that one receives independent judicial review after a disciplinary hearing and one which is 'fundamental,' such that strict scrutiny is applied for equal protection analysis." (*Kenneally v. Medical Board, supra*, 27 Cal.App.4th at pp. 497-498, fn. omitted.)

*Kenneally* relied upon *Berlinghieri v. Department of Motor Vehicles* (1983) 33 Cal.3d 392 [188 Cal.Rptr. 891, 657 P.2d 383], in which the California Supreme Court found a right to a driver's license to be fundamental such that an administrative decision relating to the license deserved independent judicial review, but not fundamental so as to require strict scrutiny in an equal protection analysis. (*Kenneally v. Medical Board, supra*, 27 Cal.App.4th at p. 498.) In contending that a medical license is more important than a driver's license, Dr. Landau misses the point. The Supreme Court in *Berlinghieri* clearly distinguished between the two senses in which an interest may be termed "fundamental" and " 'cautioned against any "blurring of two separate and distinct senses in which the term 'fundamental' is used . . . ." ' (*Graham* v. *Kirkwood Meadows Pub. Util. Dist.* [(1994)] 21 Cal.App.4th [1631,] 1643 [26 Cal.Rptr.2d 793].)" (*Ibid.*)

" '[T]he standard of review question with which [the administrative review] cases deal relates to the appropriate relationship between *administrative* and *judicial* adjudicatory decisions, and does not concern the constitutional legitimacy or validity of legislative policy judgments at all. Thus, . . . the "fundamental right" category does not identify areas in which substantive legislative judgments are in any manner constitutionally suspect or justify unusual judicial scrutiny; rather, that category simply encompasses those quasi-judicial administrative decisions that have "an impact on the individual 'sufficiently vital . . . to compel a full and independent review' by the court." [Citation.] [¶] Indeed, even a cursory review of the [administrative review] line of decisions makes it abundantly clear that the applicability of the independent judgment standard of review does not in any sense

---

statements" in an advertisement of a medical business were uncertain and indefinite where the statute did not define the term "grossly improbable statements" so as to give physicians adequate notice of the grounds for revocation.

*Ex Parte Hayden* (1905) 147 Cal. 649 [82 P. 315] did not involve a question of fundamental rights or strict scrutiny. The question there involved a criminal prosecution for violation of a statute requiring that packages of fruit for shipment must be stamped showing the locality where the fruit was grown. The court held absent any valid police purpose for such rule, and in light of a clear purpose to give some growers advantages over others, the statute was unconstitutional.

suggest that legislative measures pertaining to the individual interest at issue are properly subject to strict scrutiny review.' " (*Berlinghieri v. Department of Motor Vehicles, supra,* 33 Cal.3d 392, 396-397, italics in original; accord, *Kenneally v. Medical Board, supra,* 27 Cal.App.4th at p. 498.)

*Kenneally* was followed by *California Gillnetters Assn. v. Department of Fish & Game* (1995) 39 Cal.App.4th 1145 [46 Cal.Rptr.2d 338] and *Frankel v. Board of Dental Examiners* (1996) 46 Cal.App.4th 534 [54 Cal.Rptr.2d 128].

In *California Gillnetters Assn.,* the Court of Appeal recognized the distinction between terming a right "fundamental" so as to warrant heightened judicial scrutiny of administrative rulings affecting that right and the question whether a right is fundamental for purposes of strictly scrutinizing legislative enactments regulating the right. "Recognizing that distinction, the courts have concluded that legislative enactments affecting the right to work are tested under a 'rational basis' test because there is no fundamental right to work at a particular occupation or for a particular employer." (*California Gillnetters Assn. v. Department of Fish & Game, supra,* 39 Cal.App.4th 1145, 1155.) As the court observed in *Frankel v. Board of Dental Examiners, supra,* 46 Cal.App.4th 534, 551, ". . . there is no fundamental right to a professional license akin to the liberty interest which is given rigorous statutory and constitutional protection in criminal law."

We conclude Dr. Landau's right to continue to practice her licensed profession is not a fundamental right for equal protection purposes. ▮ Accordingly, in evaluating whether section 2337 denies her equal protection, we apply the rational basis test.

"States are granted the power to regulate professions. [Citation.] The state may regulate different professions differently. It may resolve identical problems with respect to different professions at the same time and in the same manner, or determine to regulate different professions differently. [Citation.] In evaluating professional disciplinary systems an appellate court does not sit as a super-legislature. [Citation.] Great deference to legislative judgment should be accorded. [Citation.]." (*Kenneally v. Medical Board, supra,* 27 Cal.App.4th 489, 499.)

As discussed heretofore, the purpose of this legislation was to expedite the physician discipline process, which was perceived to be in crisis, and particularly to speed final resolution of such cases. Writ review at the appellate court level will have the effect of speeding review in many such cases. As *Kenneally v. Medical Board, supra,* 27 Cal.App.4th 489, recognizes, "These dual purposes of streamlining and reducing the cost of disciplinary proceedings in general obtain even greater importance in the context

of physician disciplinary hearings. The medical profession is technically complex and is intertwined in an intimate relationship with the public interest and welfare. [Citation.] The work of physicians has life and death consequences for their patients. Negligent or incompetent physicians endanger the physical and mental health and lives of their patients. There is no profession in which it is more critical that errant practitioners be swiftly and expeditiously identified and disciplined." (*Id.* at pp. 500-501, fn. omitted.)

The limitation of appellate review of superior court decisions in physician discipline cases to review by extraordinary writ is rationally related to the governmental purposes of reducing delay in these matters. Section 2337 does not violate a physician's constitutional right to equal protection of the laws.

C. *Due Process Claim.*

We also reject Dr. Landau's claim that writ review denies her due process of laws. She relies upon *Honda Motor Co., Ltd. v. Oberg* (1994) 512 U.S. 415 [114 S.Ct. 2331, 129 L.Ed.2d 336], which held that that due process requires some degree of judicial review of punitive damages assessed and imposed by state courts. We find that case inapposite.

In *Honda Motor Co., Ltd. v. Oberg, supra,* 512 U.S. 415, the Oregon Supreme Court had rejected a claim of excessive punitive damages, because the state's Constitution had eliminated entitlement to review of a verdict's excessiveness. As described by the court, "[I]f the defendant's only basis for relief is the *amount* of punitive damages the jury awarded, Oregon provides no procedure for reducing or setting aside that award." (*Id.* at pp. 426-427 [114 S.Ct. at p. 2338], italics in original.) After tracing the common law history of such review and examining the different practice uniformly found in all other states and the federal courts, the United States Supreme Court concluded: "A decision to punish a tortfeasor by means of an exaction of exemplary damages is an exercise of state power that must comply with the Due Process Clause of the Fourteenth Amendment. The common law practice, the procedures applied by every other State, the strong presumption favoring judicial review that we have applied in other areas of the law, and elementary considerations of justice, all support the conclusion that such a decision should not be committed to the *unreviewable* discretion of a jury." (*Id.* at pp. 434-435 [114 S.Ct. at p. 3442], italics added.) Opining that postverdict judicial review—or an equivalent not there presented—was practically necessary to safeguard against arbitrary penalties, the high court held that "Oregon's denial of judicial review of the size of punitive damage awards violates the Due Process Clause of the Fourteenth Amendment." (*Id.*

at p. 432 [114 S.Ct. at p. 2341], fn. omitted; see *Rifkind & Sterling, Inc. v. Rifkind* (1994) 28 Cal.App.4th 1282, 1289-1290 [33 Cal.Rptr.2d 828].)

The high court recognized, however, that a due process violation is not established simply by showing that traditional procedures were changed. "Of course, *not all deviations from established procedures result in constitutional infirmity. As the Court noted in Hurtado [Hurtado v. California* (1884) 110 U.S. 516 [4 S.Ct. 292, 28 L.Ed. 232]], to hold all procedural change unconstitutional 'would be to deny every quality of the law but its age, and to render it incapable of progress or improvement.' " (*Honda Motor Co., Ltd. v. Oberg, supra,* at pp. 430-431 [114 S.Ct. at p. 2340].)

In contrast to the Oregon law at issue in *Honda Motor Co., Ltd. v. Oberg, supra,* 512 U.S. 415, section 2337 does not eliminate judicial review or *meaningful* appellate review. Rather, it requires that such review be by extraordinary writ, rather than by direct appeal. The lead opinion in *Powers, supra,* 10 Cal.4th 85, explicitly rejected the contention that "appellate review by extraordinary writ petition is inherently less effective than a remedy by direct appeal" with the observation that such argument "betrays a serious misunderstanding of the discretionary character of extraordinary writs." (*Id.* at p. 113 (lead opn. of Kennard, J.).) The fatal due process violation in *Honda Motor Co., Ltd. v. Oberg,* was the abrogation by Oregon law of *any* meaningful judicial review of an assertedly excessive punitive damage award. We conclude the provision of section 2337 requiring that appellate review in these cases take place through extraordinary writ petition provides meaningful review and thus does not violate due process.[12]

[12]We note that in California, administrative agency decisions are accorded judicial review in a variety of ways. Although one of the most common review mechanisms is via petition for writ of mandate under Code of Civil Procedure section 1094.5 to the superior court, and then by direct appeal to the Court of Appeal, this is by no means universal.

Judicial review of decisions of the Public Utilities Commission is via petition for a writ of review in the Court of Appeal or in the California Supreme Court. (Pub. Util. Code, §§ 1756, 1759.)

Judicial review of attorney discipline cases is by petition for review to the California Supreme Court or the California Court of Appeal. (Bus. & Prof. Code, §§ 6082, 6083.)

Judicial review of Workers' Compensation Appeals Board decisions is via petition for writ of review in the California Supreme Court or the Court of Appeal. (Lab. Code, §§ 5950-5955.)

Judicial review of Alcoholic Beverage Control Appeals Board decisions is via writ of review in the California Supreme Court or the Court of Appeal. (Bus. & Prof. Code, §§ 23090-23090.5.)

Judicial review of Agricultural Labor Relations Board decisions is by petition to the Court of Appeal. (Lab. Code, § 1160.8.)

Judicial review of Public Employment Relations Board unit determinations and unfair practice cases can be obtained only by petition for extraordinary writ to the Court of Appeal. (Gov. Code, §§ 3520, 3542, 3564.)

In a different context, we note that judicial review of the denial of a statutory preemptory challenge to a trial judge is subject to review only by extraordinary writ and may not be

## II.

### *Retroactivity*

■ Dr. Landau contends that relegating her to writ review constitutes impermissible retroactive application of the statute. The formal accusation against her was filed in April 1993 and the hearing before the ALJ occurred in 1995, with the ALJ issuing his opinion on December 20, 1995. The amendment to section 2337 became operative on January 1, 1996. (Cal. Const. art. IV, § 8, subd. (c)(1); Gov. Code, § 9600, subd. (a).) The Board adopted the ALJ's decision on February 15, 1996 and the superior court filed its decision denying Dr. Landau's petition for a writ of mandate on June 5, 1996.

■ Statutes are presumed to operate prospectively absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise. (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 287 [279 Cal.Rptr. 592, 807 P.2d 434] (*Tapia*); *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1206-1209 [246 Cal.Rptr. 629, 753 P.2d 585] (*Evangelatos*); *Aetna Cas. & Surety Co. v. Ind. Acc. Com.* (1947) 30 Cal.2d 388, 393 [182 P.2d 159] (*Aetna Casualty.*)[13]

As both the text and legislative history of section 2337 are silent on the question of retrospectivity, we conclude the measure is to be applied prospectively only.

In *Tapia*, the Supreme Court held that certain provisions of Proposition 115 (the Crime Victims Justice Reform Act) addressing the conduct of trials and other provisions changing the law to benefit defendants could be applied to the trial of a defendant charged with a murder that occurred before the effective date of the act. Certain other provisions changing the legal consequences of criminal behavior to the detriment of defendants operated retrospectively and could not be applied. The court determined that to the extent its provisions addressed the conduct of trials to be conducted after its enactment, the act applied prospectively. In so holding, the court elaborated upon the distinction between prospective and retrospective application of a statute. (*Tapia, supra,* 53 Cal.3d 282.)

---

reviewed on direct appeal of the final judgment. (Code Civ. Proc., § 170.3; *People v. Brown* (1993) 6 Cal.4th 322, 334-335 [24 Cal.Rptr.2d 710, 862 P.2d 710].) (However, a "nonstatutory" due process claim of judicial bias may be raised on direct appeal from a final judgment. (*People v. Brown, supra,* at p. 335.).)

[13]"Various statutes codify this rule of interpretation. (See, e.g., Code Civ. Proc., § 3 ['No part of [this code] is retroactive, unless expressly so declared.']; Pen. Code, § 3 [same].)" (*Tapia, supra,* 53 Cal.3d at p. 287, fn. 2.)

A law addressing the conduct of trials yet to occur addresses future conduct. (*Tapia, supra,* 53 Cal.3d at p. 288.) "Such a statute ' "is not made retroactive merely because it draws upon facts existing prior to its enactment . . . . [Instead,] [t]he effect of such statutes is actually prospective in nature since they relate to the procedure to be followed in the future." ' (*Strauch* v. *Superior Court* (1980) 107 Cal.App.3d 45, 49 [165 Cal.Rptr. 552], quoting *Olivas* v. *Weiner* (1954) 127 Cal.App.2d 597, 600-601 [274 P.2d 476].) For this reason, we have said that 'it is a misnomer to designate [such statutes] as having retrospective effect.' [Citation.]" (*Ibid.*)

"[A] law governing the conduct of trials is being applied 'prospectively' when it is applied to a trial occurring after the law's effective date, regardless of when the underlying crime was committed or the underlying cause of action arose." (*Tapia, supra,* 53 Cal.3d at p. 289.) Prior Supreme Court opinions, including *Aetna Casualty* and *Evangelatos* had not rejected this analysis. Rather, in those opinions, the court refused to apply a statute so as to change the legal consequences of the parties' past conduct. "In determining whether such statutes changed 'the legal effects of past events' (*Aetna Casualty, supra,* 30 Cal.2d at p. 394) we sometimes used the terms 'substantive' and 'procedural.' (*Id.* at p. 395; *Evangelatos, supra,* 44 Cal.3d at p. 1226, fn. 26.) However, we also made it clear that it is the law's effect, not its form or label, which is important. (*Aetna Casualty, supra,* 30 Cal.2d at p. 394; *Evangelatos, supra,* 44 Cal.3d at pp. 1225-1226, fn. 26.)" (*Ibid.*) In *Aetna Casualty, supra,* 30 Cal.2d 388, the Supreme Court annulled an award of the Industrial Accident Commission erroneously applying a statute which increased the amount of compensation for disabilities in a case involving injuries occurring prior to the statute's effective date. The court reasoned that because the law increased employers' liability for industrial disabilities, it changed the legal consequences of their past conduct. Consequently, the statute was "substantive in its effect, and its operation would be retroactive, since it imposes a new or additional liability and substantially affects existing rights and obligations." (*Aetna Casualty, supra,* at p. 395; accord, *Tapia, supra,* 53 Cal.3d at p. 290.)

In *Evangelatos, supra,* 44 Cal.3d 1188, the court held that Proposition 51, which limited an individual tortfeasor's liability for noneconomic damages to his proportionate share of fault, could not be applied retroactively as it " 'would have a very definite substantive effect' on both plaintiffs and defendants. (*Evangelato*s, *supra,* 44 Cal.3d at pp. 1225-1226, fn. 26.)" (*Tapia, supra,* 53 Cal.3d at p. 290.) As in *Aetna Casualty, supra,* 30 Cal.2d 388, the law at issue "changed the legal consequences of the parties' past conduct. Specifically, Proposition 51 reduced the amount of damages which a plaintiff could recover from a particular defendant and made it impossible

for defendants to recover contribution for noneconomic damages." (*Tapia,* at p. 290, fn. omitted.) Although rejecting the argument that the retroactivity question could be resolved by denominating a statute as "substantive" or "procedural," "neither *Aetna Casualty, supra,* nor *Evangelatos, supra,* repudiated the general rule that statutes addressing the conduct of trials are prospective. Instead, in each case we held the rule inapplicable to statutes which changed the legal consequences of past conduct by imposing new or different liabilities. based upon such conduct. [Citations.]" (*Tapia, supra,* at pp. 290-291.)

In the instant case, Dr. Landau does not claim that the amendment to the statute changed the legal consequences of past conduct by imposing new or different liabilities based upon such conduct. Certainly, the change in review procedure had no impact upon either her treatment of the two patients or the possible liabilities or penalties arising therefrom. Nor does she contend that her decision to refuse a negotiated settlement was impacted by her understanding as to her appeal rights in the event the ALJ found against her, the Board adopted that decision, and the superior court denied her petition for a writ of mandate.

Nor do we view the statute as applying retroactively because the administrative hearing before the ALJ and the ALJ's ruling preceded the January 1, 1996, effective date of the statute.[14] The amendment at issue here made no changes in the conduct of the hearing before the ALJ. *Dept. of Alcoholic Bev. Control v. Superior Court* (1968) 268 Cal.App.2d 67 [73 Cal.Rptr. 780] is analogous. There, following notice and a hearing, the Department of Alcoholic Beverage Control suspended the liquor license of real parties in interest (the Mumfords) for violations of the Alcoholic Beverage Control Act. The violations occurred in 1966. Effective November 1, 1967, the act was amended to eliminate the jurisdiction of the superior court to review final orders of the Alcoholic Beverage Control Appeals Board or to stay enforcement of a suspension order. Thereafter, review of a final board order was by way of timely application to the Supreme Court or Court of Appeal for a writ of review. The Mumfords claimed application of the revised judicial review procedure to the decision of the department would constitute an unconstitutional retrospective application of the statute. The Court of Appeal rejected this argument as follows: "Although the alleged violations of the Act with which the Mumfords were charged occurred in 1966, administrative remedies were not exhausted until the Board filed its final order on May 8, 1968.

---

[14]"Although [Code of Civil Procedure section] 1094.5(b) uses the word 'trial' in referring to the proceedings at the administrative level, what ordinarily occurs is called a 'hearing.' The superior court hearing on the petition for peremptory writ of administrative mandamus is considered the trial." (Cal. Administrative Mandamus (Cont.Ed.Bar 2d ed. 1989) Scope of Review Under CCP §1094.5, § 4.22, p. 110.)

Thus, by the time the right to judicial review matured, the amendments had been in effect for six months. The licensees had no vested right to have the jurisdiction of the courts limited as it was when the violations occurred. (*Owens* v. *Superior Court*, 52 Cal.2d 822, 833 [345 P.2d 921, 78 A.L.R.2d 388].) The new procedures on judicial review clearly governed review of the departmental decision in question. A statute affecting procedure or providing a new remedy for the enforcement of existing rights is properly applicable to actions pending when the statute becomes effective, provided that vested rights are not thereby impaired. [Citations.] In the present case, application of the amendments involved no impairment of the licensees' right to judicial review nor a denial of an opportunity to take advantage of the benefit of the revised procedures." (*Dept. of Alcoholic Bev. Control v. Superior Court, supra,* 268 Cal.App.2d at pp. 75-76.)

*Dept. of Alcoholic Bev. Control v. Superior Court, supra,* 268 Cal.App.2d 67, was relied upon by the appellate court in *Strauch v. Superior Court, supra,* 107 Cal.App.3d 45, in holding a statute which imposed on plaintiffs in malpractice suits the requirement of filing a certificate of merit operated prospectively, even as applied to causes of action accruing before the statute's effective date. (*Strauch,* p. 49.) "The new statute operated prospectively because it did not 'create a new cause of action or deprive a malpractice defendant of any defense on the merits or affect vested rights.' (*Id.,* at p. 49.)" (*Tapia, supra,* 53 Cal.3d at p. 289.) *Strauch,* in turn was relied upon by the Supreme Court in *Tapia,* as was *Andrus v. Municipal Court* (1983) 143 Cal.App.3d 1041 [192 Cal.Rptr. 341], disapproved on other grounds in *Evangelatos, supra,* 44 Cal.3d at page 1207, footnote 11, wherein the court immediately applied to pending appeals a new statute eliminating the right to appeal from certain orders of the superior court denying extraordinary relief. (*Tapia,* at p. 289.)

These authorities persuade us section 2337 operates prospectively in this case.

### III., IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

### V.

*Penalty Determination*

■ Dr. Landau contends the Medical Board abused its discretion in revoking her medical license, characterizing revocation as the "professional

---

*See footnote, *ante*, page 191.

death sentence." Such hyperbole is misleading. A physician whose medical certificate has been revoked may petition for reinstatement after three years. (Bus. & Prof. Code, § 2307.)[19]

Dr. Landau contends the penalty was unreasonable in light of the following considerations: (1) Nothing in the record suggests Dr. Landau was grossly incompetent. (2) These were her first offenses. She had practiced for 18 years with no prior record of discipline. The offenses themselves were two almost 10-year-old instances of alleged improper follow-up and using a medical assistant to excise moles. (3) The Medical Board's failure to seek an injunction under Business and Professions Code section 2312 demonstrates that it did not consider continued practice by Dr. Landau to pose a threat to public safety. (4) The Medical Board had been "out to get" Dr. Landau for years, having sought without success to prosecute her for offenses involving her office practices and having nothing to do with patient care. (5) Revocation here was arbitrary when compared with other discipline recently imposed by the Medical Board. (6) In relying in part upon her attitude and refusal to acknowledge wrongdoing, the Medical Board punished her more severely for exercising her due process rights to put on a defense. (7) There was no indication that Dr. Landau would not submit to supervision and correction.

 In reviewing the severity of the discipline imposed, we look to the correctness of the agency's decision rather than that of the trial court. We review the actions of the Medical Board to determine whether the discipline imposed constituted a manifest abuse of discretion. (*Talmo v. Civil Service*

---

[19]Business and Professions Code section 2307 provides in relevant part:

"A person whose certificate has been revoked or suspended or who has been placed on probation may petition the Division of Medical Quality for reinstatement or modification of penalty, including modification or termination of probation, after a period of not less than the following minimum periods have elapsed from the effective date of the decision ordering that disciplinary action:

"(a) At least three years for reinstatement of a license revoked for unprofessional conduct, except that the division may, for good cause shown, specify in a revocation order that a petition for reinstatement may be filed after two years. [¶] . . . [¶]

"(c) The petition shall state any facts as may be required by the division. The petition shall be accompanied by at least two verified recommendations from physicians and surgeons licensed by the board who have personal knowledge of the activities of the petitioner since the disciplinary penalty was imposed. [¶] . . . [¶]

"The panel of the division or the administrative law judge hearing the petition may consider all activities of the petitioner since the disciplinary action was taken, the offense for which the petitioner was disciplined, the petitioner's activities during the time the certificate was in good standing, and the petitioner's rehabilitative efforts, general reputation for truth, and professional ability. . . .

"The administrative law judge designated in Section 11371 of the Government Code reinstating a certificate or modifying a penalty may recommend the imposition of any terms and conditions deemed necessary."

*Com.* (1991) 231 Cal.App.3d 210, 226 [282 Cal.Rptr. 240]; *Schmitt v. City of Rialto* (1985) 164 Cal.App.3d 494, 500 [210 Cal.Rptr. 788]; Cal. Administrative Mandamus, *supra*, Appeal From Superior Court Judgment, § 14.26, p. 463; *id.* (Cont.Ed.Bar 1996 supp.), p. 117.) "The penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated. (*Skelly* v. *State Personnel Bd.* [(1975)] 15 Cal.3d [194,] 217 [124 Cal.Rptr. 14, 539 P.2d 774]; *Magit* v. *Board of Medical Examiners* (1961) 57 Cal.2d 74, 87 [17 Cal.Rptr. 488, 366 P.2d 816].) Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed. (*Nightingale* v. *State Personnel Board* (1972) 7 Cal.3d 507, 515 [102 Cal.Rptr. 758, 498 P.2d 1006].)" (*Barber v. State Personnel Bd.* (1976) 18 Cal.3d 395, 404 [134 Cal.Rptr. 206, 556 P.2d 306].)

"In reviewing the exercise of this discretion we bear in mind the principle '[c]ourts should let administrative boards and officers work out their problems with as little judicial interference as possible. . . . Such boards are vested with a high discretion and its abuse must appear very clearly before the courts will interfere.' (*Maxwell* v. *Civil Service Commission* (1915) 169 Cal. 336 [146 P. 869]; accord *Skelly* v. *State Personnel Bd.*[, *supra*,] 15 Cal.3d 194, 217 . . . .)" (*Talmo v. Civil Service Com., supra,* 231 Cal.App.3d 210, 230.)

In medical discipline cases, the "highest priority" is protection of the public. (Bus. & Prof. Code, § 2229, subds. (a) & (c)); cf. *Talmo v. Civil Service Com., supra,* 231 Cal.App.3d 210, 230 ["[t]he 'overriding consideration' in cases of public employee discipline 'is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, "[h]arm to the public service." ' "].)

 Because we conclude that reasonable minds could differ over the appropriateness of the penalty imposed, we find no manifest abuse of discretion.

We have already determined that the findings of gross negligence were supported by substantial evidence. Dr. Landau's failures to follow up with these two patients constituted an extreme departure from the standard of care and had extremely serious consequences—S.B. in fact died.

That other cases in which revocation has been upheld involve criminal offenses, drug offenses or sexual misconduct is not determinative that revocation in the circumstances presented here was an abuse of discretion. As we have previously discussed, since 1990, the physician discipline

system operated by the Medical Board has undergone a comprehensive overhaul in response to a perceived crisis in physician discipline. One of the express goals was to increase the number of professionals being disciplined. (State and Consumer Services Agency, General Services, Enrolled Bill Rep. for Sen. Bill 2375, at p. 1.)

Nor are the cases relied upon by Dr. Landau to support her claim that the penalty here was unreasonable analogous.

In *Harris v. Alcoholic Bev. etc. Appeals Bd.* (1965) 62 Cal.2d 589 [43 Cal.Rptr. 633, 400 P.2d 745], the Alcoholic Beverages Appeals Board reversed the department's revocation of a restaurant owner's license to sell alcoholic beverages on his restaurant premises. The trial court affirmed that determination, as did the Court of Appeal. The circumstances of the revocation were that within an eight-day period several improper acts were committed, including the owner's allowing his teenage son to serve beer to minors and a waitress on one occasion served a glass of beer to an intoxicated person. The appellate court took judicial notice of a bulletin from the department containing a schedule of penalties under which the standard penalty was suspension for a total of not more than 75 days for the same or similar offenses as the one for which the department had revoked the license.

In *Magit v. Board of Medical Examiners, supra,* 57 Cal.2d 74, the superior court overturned a license revocation after determining that Dr. Magit, the director and chief anesthesiologist of a hospital, was not guilty of unprofessional conduct in allowing unlicensed persons to administered general, spinal, and epidural anesthetics in the hospital. The appellate court found that Dr. Magit was guilty of unprofessional conduct and so reversed the superior court. However, the appellate court also concluded that under the circumstances, imposition of the maximum penalty of license revocation was an abuse of discretion. It relied upon the following considerations in so holding: "The court on sufficient evidence found that Dr. Magit acted in the utmost good faith, that Rios, Celori, and Ozbey were doctors of medicine with specialized training in anesthesiology and were highly competent anesthetists, and that on the basis of legal advice Dr. Magit was justified in assuming that the authorizing of the three unlicensed men to administer anesthetics was legal. In considering whether persons such as Rios, Celori, and Ozbey could legally administer anesthetics Dr. Magit was confronted with a question not specifically answered by the code or by any decision of our courts, and the *Chalmers-Francis* case had held that, in addition to licensed physicians, licensed nurses could administer anesthetics." (*Id.* at p. 88.) Therefore, the appellate court returned the case to the board for reconsideration of the penalty to be imposed.

In the seminal case, *Skelly v. State Personnel Bd.*, *supra*, 15 Cal.3d 194, a 64-year-old physician civil servant whose work was rated good to superior, was dismissed because he had extended his lunch break beyond his allotted one hour on numerous occasions, generally by five to 15 minutes, and had twice left the office for several hours without permission. This behavior occurred after repeated warnings and admonitions by administrative officials, who made reasonable efforts to accommodate his needs and despite a one-day suspension for similar misconduct.

The Supreme Court held dismissal to be an abuse of discretion under the circumstances. In its opinion, the court noted, ". . . the record is devoid of evidence directly showing how petitioner's minor deviations from the prescribed time schedule adversely affected the public service. To the contrary, the undisputed evidence indicates that he more than made up for the excess lunch time by working through coffee breaks as well as on some evenings and holidays. With perhaps one or two isolated exceptions, it was not shown that his conduct in any way inconvenienced those with whom he worked or prevented him from effectively performing his duties." (*Skelly v. State Personnel Bd.*, *supra*, 15 Cal.3d at p. 218, fns. omitted.) The court further relied upon findings of the hearing officer, adopted by the Medical Board that found: " 'Appellant is 64 years old, has had a long and honorable medical career and is now handicapped by serious sight and speech difficulties. Also, the Senior Medical Consultant has no complaints about appellant's work. [¶] Consideration of appellant's age, his physical problems, the lack of any apparent affect [*sic*] on his work and sympathy for the man and his family are all persuasive arguments in favor of finding that appellant be given just one more chance.' " (*Id.* at p. 219.) Finally, the Supreme Court noted that "In testifying, petitioner apologized for his conduct and promised to adhere strictly to the rules if given another opportunity to do so." (*Ibid.*)

The combination of these circumstances rendered dismissal an abuse of discretion.

None of these cases persuade us that the Medical Board abused its discretion here. The offenses committed here were far more serious, both in the nature of the conduct found grossly negligent and the consequences to the patients involved, than those of the cited cases. Nor can Dr. Landau point to a good faith mistake or reliance upon the advice of legal counsel as in *Magit v. Board of Medical Examiners, supra*, 57 Cal.2d 74, or to anything in her testimony acknowledging her mistakes and promising to reform her conduct, if given the opportunity as in *Skelly v. State Personnel Bd., supra*, 15 Cal.3d 194.

This case appears to us more like *Dresser v. Board of Medical Quality Assurance* (1982) 130 Cal.App.3d 506 [181 Cal.Rptr. 797], wherein the

Medical Board revoked the license of a psychologist found to have had sexual relations with two patients while treating them. *Dresser* did not involve a criminal offense. As in this case, the doctor argued that the penalty of license revocation was grossly disproportionate to his alleged conduct and the fact that four and one-half years had passed between the last sexual incident and the time of the Board's decision revoking his license. During this period there was no evidence that the appellant practiced psychology other than admirably and no other incident of professional misconduct had ever been charged against him. Nevertheless, the appellate court upheld the license revocation, concluding that reasonable minds could differ as to the appropriateness of revocation in the circumstances. (*Id.* at p. 519.)

Similarly, in this case we face not one, but two instances of gross negligence in the failure to adequately follow up with patients whose pathology reports indicated the existence of a possible malignant melanoma. One of those patients, S.B., ultimately died. In addition, the use of a medical technician on multiple occasions with patient J.Y. to excise moles undermines Dr. Landau's contention that revocation was based on an isolated event over an otherwise exemplary 18-year career. As in *Dresser*, the passing of a significant period of time following the unprofessional actions and the actual license revocation is certainly a factor to be considered in assessing discipline; but that factor is not determinative.

■ " 'The propriety of a penalty imposed by an administrative agency is a matter within its discretion and, absent a manifest abuse thereof, it will not be disturbed upon review by a trial or appellate court. [Citations.] Even if the penalty were to appear to be too harsh according to the court's evaluation, the court is not free to substitute its own discretion for that exercised by the administrative agency. [Citation.] (Fn. omitted.)' [Citations.] Even were the penalty to appear harsh to us, still we would not be free to substitute our discretion for that of the administrative body. The facts that reasonable minds might differ as to the propriety of the penalty imposed fortifies the conclusion that the administrative body acted within its discretion (see Code Civ. Proc., § 1094.5, subd. (e); [citations].)" (*Dresser v. Board of Medical Quality Assurance, supra,* 130 Cal.App.3d 506, 518-519.)

■ Furthermore, Dr. Landau's attitude toward the allegations and her credibility were relevant to the determination of penalty. The ALJ's assessment of Dr. Landau's credibility played an important role in his recommendation to revoke her license as made clear in his written decision: "As serious as those matters [inadequate follow-up with patients] are, of even greater concern is [Dr. Landau's] allowing a medical assistant to provide the sort of patient care which only a trained dermatologist should render. To

permit a minimally trained staff member to evaluate whether or not potentially life-threatening lesions should be removed, and then to permit that person to perform the excisions necessary for removal and biopsy of those lesions, is unconscionable. *For [Dr. Landau] to maintain the charade that it was she, and not the medical assistant, who performed the procedures on patient J.Y. is almost as troubling.* Considering the foregoing, it is determined that protection of the public interest demands revocation of [Dr. Landau's] certificate to practice medicine." (Proposed Decision, ¶ 7, pp. 14-15, italics added.)[20]

We reject Dr. Landau's claim the ALJ's reference to her "charade" demonstrates that the Medical Board improperly imposed the maximum penalty in retaliation for her exercise of her due process right to defend herself. Dr. Landau relies upon *In re Lewallen* (1979) 23 Cal.3d 274, 278 [152 Cal.Rptr. 528, 590 P.2d 383, 100 A.L.R.3d 823], wherein several remarks by the trial judge indicated that he had improperly based defendant's sentence, in part, on the defendant's rejection of a plea bargain and election to proceed to jury trial. The California Supreme Court held that, while a more severe sentence may be imposed following trial than would have been imposed had defendant pleaded guilty, the more severe sentence must be based upon legitimate factors revealed during trial or in the presentence report. (*Id.* at p. 281.)

Dr. Landau refers us to no case outside the criminal law sentencing context which refers to this rule and we question its application to this civil discipline proceeding context. (But cf. *Toyota of Visalia, Inc. v. New Motor Vehicle Bd.* (1987) 188 Cal.App.3d 872, 878 [233 Cal.Rptr. 708].)[21]

In any event, we find the claim to be without merit in these circumstances. It is clear that a sentencing court may not increase a defendant's sentence to punish him or her for having asserted constitutional or statutory procedural

[20]Following the issuance of the tentative decision, the court at the hearing on the new trial motion, held May 23, 1996, observed that it thought the penalty was "kind of big, too," but that it would also take into account the credibility issues, and Dr. Landau's refusal to admit to making a mistake.

Commenting on the penalty and the arguable appearance that it was punitive, the court asked counsel for the Board, "Is this normal?"

[21]"In the field of criminal law it is well established that evidence concerning an individual's postconviction conduct is relevant to his sentence and that updated information should be obtained when resentencing occurs long after the original probation officer's report was obtained. [Citations.] An automobile dealer facing the loss or suspension of his license, and thus his livelihood, is entitled to no less. This is particularly true in this type of administrative proceeding where the applicable principle is that the primary purpose of punishment is protection of the public rather than punishment of the wrongdoer. [Citation.]" (*Toyota of Visalia, Inc. v. New Motor Vehicle Bd., supra,* 188 Cal.App.3d at p. 878.)

rights. (*In re Lewallen, supra*, 23 Cal.3d 274.) However, no case "imposes an absolute ban on imposition of a sentence higher than that which might have been proposed before the defendant asserted his constitutional or statutory right: There must be some showing, properly before the appellate court, that the higher sentence was imposed as punishment for exercise of the right." (*People v. Angus* (1980) 114 Cal.App.3d 973, 989-990 [171 Cal.Rptr. 5].) "In *Lewallen* the Supreme Court said: 'Thus it is clear that under appropriate circumstances a defendant may receive a more severe sentence following trial than he would have received had he pleaded guilty; the trial itself may reveal more adverse information about him than was previously known. A court may not, however, impose a sentence that conflicts with a defendant's exercise of his constitutional right to a jury trial. [Citation.]' " (*Id.* at p. 990.)

Moreover, the Medical Board properly may take account of the accused doctor's attitude. (*Yellen v. Board of Medical Quality Assurance* (1985) 174 Cal.App.3d 1040, 1059 [220 Cal.Rptr. 426].) "[E]ven in a criminal proceeding, the court may take into account the defendant's attitude toward the offense and his character as evidenced by his behavior and demeanor at trial." (*Ibid.*)

Here, the record supports the ALJ's determination that Dr. Landau lied during her testimony about her follow-up with patient S.B. and the excision of J.Y.'s moles. This "charade," in which she blamed the patients and demonstrated neither understanding of her own wrongdoing nor remorse therefore, provides solid support for the decision to revoke her license. Unlike those criminal cases in which the defendant was able to demonstrate that the penalty was increased because he or she chose to go to trial rather than plea bargain, there is no indication here that the penalty was increased because Dr. Landau asserted her due process rights to a hearing. To the extent we may speculate that the penalty was more severe than it otherwise might have been had she testified truthfully rather than lied at the hearing, accepted responsibility for her negligence, or made some credible showing of mitigation, such increase in penalty was not the result of her exercising her due process rights to defend herself.

We believe that under the circumstances presented here, reasonable minds could differ over the appropriateness of license revocation. No more is required to find that the Medical Board acted within its discretion in revoking Dr. Landau's medical license. (E.g., *Dresser v. Board of Medical Quality Assurance, supra,* 130 Cal.App.3d 506, 519.)

## VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The appeal is dismissed. The alternative writ is discharged and the petition for writ of mandate is denied.

Haerle, J., and Ruvolo, J., concurred.

---

*See footnote, *ante*, page 191.